[No. 37834. Department Two. April 21, 1966.]

JOHN BAERTSCHI, *Respondent,* v. WILLIAM H. JORDAN *et al., Defendants,* DARRAL E. WOOLSEY *et al., Appellants.**

*Rutherford, Kargianis & Shinn* and *Samuel C. Rutherford,* for appellants.

*Burns & Schneiderman* and *Barry Alan Schneiderman,* for respondent.

COCHRAN, J.†—This appeal arises out of an action claiming conspiracy to defraud.

Plaintiff brought suit against William H. Jordan and wife, Darral E. Woolsey and wife, and Elvin E. Woolsey and wife for $4,000. At the close of plaintiff's case, he moved to amend the pleadings to conform with the proof by increasing the prayer for relief to $14,000. This motion was granted

*Reported in 413 P.2d 657.

†Judge Cochran is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

without objection. At the close of all the evidence, the court dismissed the complaint as to the defendants William H. Jordan and wife and Elvin E. Woolsey and wife and awarded plaintiff judgment for $14,000 against the defendants (appellants), Darral E. Woolsey and Vernis Woolsey, his wife.

The facts of this case start with the spring of 1961, when defendant Jordan and appellant Woolsey organized a corporation to sell used cars. Through this corporation, called the Consumers Co-op Union, Inc., it was their hope to capitalize on Jordan's position as manager of the Group Health Credit Union, with its 20,000 members and assets, as a source of customers and financing.

, Woolsey had experience as a car salesman, but no money. Jordan had considerable business experience and some money. It was agreed that Jordan would put up the initial capitalization for the business while Woolsey would continue to work at his regular car selling job until some source of financing car purchases could be found.

Jordan had had some business dealings with plaintiff (respondent) and knew that he had a substantial amount of money invested with Group Health Credit Union. Respondent was a man 61 years of age who had had only 8 years of schooling and no personal business experience. Jordan wrote a letter to respondent on the credit union letterhead, dated June 14, 1961, and which stated in part:

Dear John:

Flooring loans work this way. When a car is bought at a wholesale price, the title is held by the one who loans the money, and when the car is sold at retail the money obtained is placed in a trust account of the one who made the flooring loan. In this way their is no risk because the value of the car is always behind the loan.

I would not even suggest this if I did not feel the investment was perfectly safe. The regular bank terms for such financing is $6\frac{1}{2}\%$. We would pay you this amount. If you take money from your credit union account before the end of the dividend period, we [w]ould be glad to make up to any dividends lost from withdrawing before the end of the dividend period. The interest we will pay is $6\frac{1}{2}\%$ compared with the 4% you are getting from the

Credit Union. This would not hurt the Credit Union because we really have surplus savings on hand.

I will be glad to explain this further, show you the lot we have leased, and have you meet the gentlemen who are experienced in the car business.

In response to this letter, respondent met with Jordan at the credit union office, where he was solicited to put money in the car business. He was again told orally what had already been said in the letter of June 14th. Appellants were not present during this conversation, but arrived at the office later and for the first time they were introduced to respondent.

Appellants testified that they knew nothing about the letter being written and never saw it, and did not know what Jordan may have told respondent about the manner of handling titles and putting receipts from sales into a trust account for respondent. Jordan, however, testified that he was sure he told them of this.

On the same day and while appellants, respondent and Jordan were still at the office, respondent drew $10,000 from the Group Health Credit Union and loaned it to the Consumers Co-op Union, Inc., in return for which he received a promissory note from the latter for that amount due December 31, 1961, and signed by Jordan as president and appellant Vernis Woolsey as secretary. The note bore 6½ per cent interest.

In August of 1961, Jordan was fired as manager of the credit union and went through a period of despondency and took no active part in the car business. In September, the business had not yet prospered and the appellants became concerned about the ability of the company to pay the $10,000 note of the respondent by its due date. Accordingly, appellants and respondent met on September 9, 1961, at the used car office and a new note for $10,000 at the same interest rate, but not to be payable until the end of June, 1962, was signed on behalf of the corporation by Darral E. Woolsey, vice-president and Vernis Woolsey, secretary. Respondent surrendered the original note and accepted the

new one in lieu thereof. Appellant husband told respondent the extension was essential, so that it would not be necessary to sell the cars to pay respondent in December, as this was too soon for the corporation to have sufficient funds to pay respondent. At this same time, appellants gave respondent a check for $112 interest and said he would get interest every 2 months. Respondent had not yet received any titles to cars and never asked for any, nor did he ask for an accounting.

Things continued in this manner, as far as respondent was concerned, until February 1, 1962. He received no titles to cars and was paid no interest; neither did he demand titles or an accounting. From September on, the appellants more and more used the money of the corporation for their own purposes. Mrs. Woolsey drew over $2,000 in wages, drawings and other sums not identified. E. E. Woolsey was paid over $1,000 for no apparent reason, and Darral Woolsey drew hundreds of dollars labeled drawings. Also the Woolseys drew checks for payments on a boat, on a sewing machine, to motels and to cash. Some of the latter being cashed at a Ballard tavern.

On February 6, 1962, appellants requested Jordan to accompany them to respondent's home from where they went to a bar where the appellant husband told respondent he wanted to borrow $4,000 so that he could show $6,500 in the bank account which he said was needed to get outside financing. Appellant husband told respondent the business was doing all right, and respondent was not advised of any financial problems. The company, however, had not done any business since December 31, 1961, and had kept no books or records since then. A check to the state for taxes in the sum of $384.42 had been written in January of 1962, but was dishonored by the bank for insufficient funds. Appellants led respondent to believe that E. E. Woolsey had put $2,500 into the business when, in fact, E. E. Woolsey had not put any money in and knew nothing about such an investment. Appellants told respondent he would get his money back in 2 weeks.

It being represented to respondent that this would help him get interest on his $10,000 note and the principal when due, he then wrote a check in the amount of $4,000, payable to E. E. Woolsey, because he was an older man with some means, and respondent had more confidence in him. E. E. Woolsey, believing the $4,000 was for additional financing, endorsed the check, and respondent was given a 90-day note for the $4,000, signed by both appellants as officers of the company. There is no record of what became of respondent's $4,000.

In March of 1962, respondent was asked by appellant husband to come to the car lot and bring his $10,000 note and the $4,000 note. Respondent was then advised that appellants were going to change the business and its name, or leave the business. Respondent was told he could have the cars now on the lot, or that appellants would give him their personal unsecured 3-year note for the net assets of the corporation. Appellants said there were $9,000 worth of cars and that they owed taxes and rent of $1,300. Respondent was persuaded to give up the two notes totalling $14,000 and accepted appellants' personal note for $7,700. Appellants did not reorganize the business, but instead liquidated it.

It is well settled law in this state that, in order to recover for fraud, the following must be proved: (1) a representation of an existing fact; (2) its materiality; (3) its falsity; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person to whom it is made; (6) ignorance of its falsity on the part of the person to whom it is made; (7) the latter's reliance on the truth of the representation; (8) his right to rely upon it; (9) his consequent damage. *Swanson v. Solomon,* 50 Wn.2d 825, 314 P.2d 655 (1957).

The burden is upon plaintiff to prove the existence of all these essential and necessary elements that enter into its composition. All of the ingredients must be found to exist. The absence of any one of them is fatal to a recovery.

*Puget Sound Nat'l Bank v. McMahon,* 53 Wn.2d 51, 330 P.2d 559 (1958).

■ This court has repeatedly held that fraud is never presumed, but must be proved by clear, cogent and convincing evidence. *Brown v. Underwriters at Lloyd's,* 53 Wn.2d 142, 332 P.2d 228 (1958); *Ramsey v. Mading,* 36 Wn.2d 303, 217 P.2d 1041 (1950); *Dobbin v. Pacific Coast Coal Co.,* 25 Wn.2d 190, 170 P.2d 642 (1946).

With these rules in mind, it is necessary to examine each transaction that resulted in some action being taken by respondent.

The initial contact that resulted in respondent becoming interested in an investment was the letter from Jordan to him and his conversations with Jordan at the latter's office. We find nothing in this letter or conversation that amounted to a false representation of an existing fact.

■ There were perhaps some representations as to things to be done in the future. Generally fraud cannot be predicated upon a representation as to a future event, or a promise to do something in the future. *Shook v. Scott,* 56 Wn.2d 351, 353 P.2d 431 (1960); *Nyquist v. Foster,* 44 Wn.2d 465, 268 P.2d 442 (1954).

Respondent contends, however, that a promise to do something in the future with no present intent to do so, can be classified as a false representation of an existing fact, but we find no evidence or reasonable inference from the evidence that such was the case here.

Assuming that the statements in the letter could be considered false representations, the fact remains that these appellants never saw the letter or authorized it. The most that could be said as to them is that they knew generally how the business was to be operated.

It is argued by respondents that there was fraud at the time the renewal note was given in September. The only additional statements made by appellants at that time were that the extension was necessary, and that respondent would get interest every 2 months. Again these cannot be considered as false representations of an existing fact. The

extension was necessary and so far as can be determined, there was at that time an intention to pay interest as promised.

In addition, respondent did not prove nor do we find any damages suffered by him proximately caused by the fraudulent conduct alleged to have been committed in September of 1961. The respondent having failed in his burden of proving the necessary elements of fraud, it follows that so much of the judgment as was based on the $10,000 renewal note should be disallowed.

We concur, however, with the conclusions reached by the trial court as to the $4,000 note given in February, 1962. At that time, appellant husband told respondent the business was doing all right, whereas in fact it was not even functioning and had not since December 31, 1961, and did not have funds to cover a $384.42 check to the state for taxes. He led respondent to believe that his father had or was going to put $2,500 in the business, when in fact his father, E. E. Woolsey knew nothing about such an investment. When respondent relied upon these very material but false facts, which were known to appellant to be false and which resulted in respondent parting with an additional $4,000 of his money, all of the essential elements of actionable fraud were present and respondent is entitled to judgment against appellants for this amount.

Appellants urge that the $7,700 personal note given by them in March of 1962, was an accord and satisfaction or a novation. This note, however, was given in lieu of the remaining assets of the corporation that existed at this time which were available to apply towards satisfaction of respondent's investment. It was not a compromise of respondent's claim against the appellants personally for any fraud they may have committed.

The judgment is modified by reducing the award from $14,000 to $4,000. As so modified, the judgment is affirmed. Neither party will recover costs.

ROSELLINI, C. J., DONWORTH, FINLEY, and HAMILTON, JJ., concur.